Good morning, Your Honors. I'm Anthony Pallack, and I'm appearing on behalf of all the plaintiffs or appellants in this appeal. And the appellants would like to waive their opening argument and reserve their entire time for rebuttal. Counsel, let me tell you something. Okay. When you brief a case of this complexity in this many parties, it would be real helpful if you start off your brief with a statement of what the case is about. I read through your entire opening brief waiting for some explanation of what this case was all about. And, you know, working up from the facts to whatever makes it very difficult. So I had to rely on the answering brief. And I say this as a constructive suggestion. I probably wouldn't have said it right now if you weren't if you want to. Well, we would like to do that, Your Honor, if that would aid the court. Well, the problem is I'm not going to let you sandbag the other side. So if you have some arguments you want to make, make them. But don't, you know, if you're basically willing just to respond to what counsel says, we're not going to flip the order of argument. Oh, that's fine, Your Honor. I mean, it's up to the court, obviously, and we respect that. So thank you for the criticism, and we'll proceed then with our argument. It was a constructive suggestion. Thank you very much. This case is an important case because it involves the relationship between administrative law enforcement and criminal law enforcement. The plaintiffs in this case were originally charged with misdemeanor building and zoning code violations. The lawsuit itself is a lawsuit for housing discrimination based on those enforcement actions. In this regard, I want to move to a fact that may help the Court understand the case better. There were three different searches or inspections of the property which give rise to what we believe is evidence of invidious intent to discriminate. Am I going in a direction that's helpful to the Court? Let me ask. Mr. Maddox is standing to bring the housing discrimination claim? Definitely. In fact, the Bennett case, which was cited by Judge Burrell in the district court, also cites a case called Tropicante v. Metropolitan Life Insurance, which clearly states that just about anybody can bring a housing discrimination claim, that that was the clear intent of the Congress when they enacted the Fair Housing Act and also under the Civil Rights Act of 1968. That in this case, Mr. Maddox, the lead plaintiff, I guess you could call him, was defending his subordinate, Ms. Alexandru, who was complaining of unlawful actions taken during the inspection of that residence. It was Mr. Maddox who informed me when he became my client that this was due to an extensive amount of housing discrimination against similar residences involving disabled persons or low-income persons under the State law, and that was his relationship to this case. He is defending their rights and as such has standing to bring his cause of action. He has evidence that the authorities in general were pursuing group homes for disabled persons in ways that were more harsh or aggressive than they pursued the people that owned other types of group residences. Absolutely. And, in fact, if we were allowed to finish discovery, we probably would have had a lot more evidence in that regard. And, fortunately, one of the witnesses, Ms. Linda Kimura, who is the chief of staff for Isla Collin, admitted in her testimony that most of that evidence that she kept was thrown out by her secretary only a month after we requested it. Well, you say a lot more evidence. What evidence is there that there was anybody who was similarly situated who was treated differently? Well, Judge Reimer or Justice Reimer. No, it's Judge. You had it right the first time. All right, Judge Reimer. Thank you. Mr. Maddox has alleged in his declarations that there were several different group homes. I know. It's all conclusory, and that's exactly what he said. So my question is what evidence is there that anybody who was similarly situated was treated differently? I was getting there, if you don't mind. In his position as the chairman of the nuisance response team, it was Mr. Maddox's job to administer the program that the county had set up called the community prosecution program. Under the auspices of the nuisance response team, the nuisance response team had a list of problem properties that we've attempted to obtain, and I hope it still exists, but we believe that that would have identified the properties that were subject to these inspections, all of them, and we could have shown that these were inspections that were brought primarily at the request of neighbors who didn't like disabled people living in their neighborhoods, who didn't like low-income people living in their neighborhoods. And Sacramento County is famous for not providing low-income housing to its low-income residents in a manner that should be adequate. So Mr. Maddox would have the ability to testify to all these specific issues because he was the man in charge of this program at the time. Okay. I'm sorry. Go ahead. Okay. Mr. Maddox could testify about this disparate enforcement that was carried out despite his objections or under his supervision? Well, no. I mean, the problem with disparate impact, of course, is you have to have a lot of cases in order to show. No, I thought it was disparate treatment. Disparate treatment? I thought you were saying that – I thought it was a disparate treatment argument, that in other words the owners of group homes for disabled were treated – for disabled persons were treated in a more aggressive manner than the owners of group homes for people that were not disabled. Yes. And we also believe we have invidious intent also. But in regard to disparate treatment or disparate impact, which is really a statistical sort of evidence, the fact that Mr. Maddox was the nuisance response team leader for six, five or six years, would have given him that kind of knowledge. He had knowledge of information that existed and would have continued to exist even after the time that he stopped being the NRT chairman. That was evidence that we attempted to obtain but then were prevented from doing so. If this Court were to remand in the case – reverse, in the case were to go back before the district court and Mr. Maddox were to prevail, what's the relief? What is his remedy? What's the remedy? For Mr. Maddox specifically. Well, I – Or for everybody. Is he bringing it on behalf of somebody else? I thought this case was being brought on his own behalf. Oh, no. He has his own remedy, yes. But he also is bringing it on behalf of the people who have been discriminated against, which he can clearly do under the Fair Housing Act and under the Civil Rights Act of 1968 as used by analogy, I guess. And will the district court then provide a remedy for those individuals? Yes. Well, in the case of Mr. – I'll go through each one real quickly. In the case of Mr. Maddox, I'm not so sure that his damages are quite significant in lieu of the fact that he hasn't lost a lot of money as a consequence of his displacement from his position. However, a verdict in his favor would send a clear message to the county that it needs to observe the rights of these persons, that it would vindicate the rights of Mr. Maddox and Ms. Alexander to stand up on their behalves. And in fact, it should. Is he using the discrimination against the disabled and more aggressive treatment with respect to them as a reason why he was reappointed so that his only remedy is damages for, you know, the adverse employment action? I mean, is that the theory? Well, at least as far as damages go. Now, we didn't ask for injunctive relief, although I think we asked for a declaratory. But the point is, is that he does have an interest that needs to be vindicated, even for the public interest in this case, because, in fact, his reassignment was the direct consequence of his concerns regarding unlawful searches and seizures at group homes generally. So, I mean, I think there's something here that is important to everybody. I mean, in terms of the vindication of his rights. And I think the Supreme Court, although I didn't cite the case, the Supreme Court has recently held that pecuniary loss is not necessary in order to show a wrongful employment action. Mr. Maddox was moved from his position. His title was kept intact, which is very strange because there's not room on the budget for one chief zoning code enforcement officer in the county of Sacramento, and yet they continued to call him such while they put him essentially in a closet counting paperclips. And I'm not exaggerating. I mean, he was relegated to a small room in the county executive's office where he had no responsibilities and no duties and was still the chief zoning code enforcement officer. I think that that speaks to the concerns that the county has over their own conduct, essentially. They don't want us to see what really happened. And I think they've made that clear in the way that they've conducted themselves in the case itself. Thank you, Judge Farmer. I'm a little off track now, which I guess happens in oral argument. But I did want to point out that in regard to the inspections themselves, the January the October 25th inspection, which was the second inspection, it occurred on a Monday after a Friday inspection where none of the inspectors actually went inside any of the buildings. They simply surveyed the property outside. On the 25th, we want to point out that the prosecutor in this case, Natalia Luna, accompanied a building inspector, Robin Rasmussen, to the residence. And this is important because in the opposition to our brief, the county has argued, and also we want to point out that the county is a defendant here, so the county had some role to play in this, not just the district attorney's office. But the county is, and the other defendants, are arguing that there was consent to that search, and so, therefore, the prosecutor had a probable cause, and, you know, Buckley is not a problem for them. Well, that's not true because when a prosecutor shows up with a building inspector, nobody's been inside the residences yet. She can't have probable cause at that point as to any of the violations inside the residence. She shows up with the building inspector. This is misleading. This is misleading the people who occupy the property that this is an administrative inspection, and it's galling to us that a law, a criminal law enforcement officer, in this case a district attorney, would use administrative inspectors to essentially bootstrap the Fourth Amendment. It's really repulsive to us. And even though this is not about necessarily the violation of Fourth Amendment rights, that goes to invidious discriminatory intent. There is case law that, you know, that permits law enforcement to use misleading or ruses tactics to obtain evidence. Let me ask a question about the consent issue, though. I know it's your argument that the district court erred in concluding that there are no disputes about whether or not consent was given for that search on that Wednesday the 25th. But I understand that your position is that there's no dispute that the votes were willing for Ms. Alexandru to enter and search. It was that they objected to others being involved in that search. That's, as I understand, the plaintiff's position. And here's something that wasn't addressed in the briefs, and I'm not even sure how it fits, but is it – can an individual object to one searcher but not another for purposes of administrative search? Yes, absolutely. In fact, I'm a criminal defense lawyer, and that's very clearly established law. Nobody briefed it, and we could do so later. But – and I'm running out of time, and I want to reserve some time for rebuttal. But in regard to the search of the 27th, which is the search you're actually talking about, which was two days later, there was no exigent circumstance. There was no warrant. Twenty law enforcement officers defended upon the – descended upon the property. The votes had objected to a search that day already with Ms. Alexandru. They were confronted by overwhelming force, essentially, which vitiates consent under the criminal law according to the Constitution. And even though they gave this limited access consent, the Fourth Amendment clearly – the law governing the Fourth Amendment as it's been adjudicated by these courts clearly indicates that the control of consent is at the discretion of the person who has control and access to the property. So these – these law enforcement officers, when they're restricted to five people, fine. But that's not what happened. All 20 of them entered the property. All 20 of them went to the rooms. They knocked on the doors or sometimes entered without – without permission to the residents' rooms and the – and the buildings. And this is – even if consent was given, it wasn't observed in that regard, in the regard that you're speaking of. And you want to save the rest of your time? Yes, please. Thank you. Good morning, Your Honors. My name is Amanda Butts. I'm here on behalf of the appellees in this matter. I think, just as an initial statement, a lot of the difficulty in briefing the appeal as well as the motion for summary judgment and the law of court is the constantly changing claims that are made by the appellees, in that they were very vague in their initial complaint and their – and throughout the time of briefing and going through up to this court now, the claims have changed. Initially, I think we start with four different cases in our motion for summary judgment and in the original complaint where you have a property claim and an employment claim and then within them multiple different claims. That really probably should be two different cases. On the housing side, which appellants have stated is the crux of their case, their main complaint is that this is a housing discrimination issue, which they've alleged under FEHA, the FHA, equal protection, and then this lingering unlawful inspection claim, which they've actually waived by saying that consent isn't the issue. And, in fact, Ms. Nguyen, I believe is how you pronounce it, could not have even granted consent, whether she did or not, because she didn't have authority over the property. So to get back to that housing discrimination issue, they have to show intentional discrimination. There's no evidence that this home was targeted specifically as opposed to other similarly situated cases. There's no evidence that the county had a policy or practice or a custom of targeting homes for mentally ill individuals or for low-income individuals. And there's independent evidence that the county in this specific instance was made aware of the problems that actually existed on this property due to a phone call from the fire department, which is a wholly independent public entity, that found actual issues at the property of non-working smoke detectors, a trench in the ground that was an issue for the type of residents that were living on that property. And there's no dispute that those conditions existed at the time that the fire department responded to a call there and that the fire department alerted the county to those issues and that the county then inspected the property based on concern for those conditions that actually existed. Those are the facts in this case. And there's no evidence of any policy or practice or anything along those lines to bring in incidences related to any other type of property or any other case. What's the rationale for having the DA's office associated in the inspection or search along with the administrative? I believe that because there are many group homes in the county and that there have been concerns with health and safety and security related to group homes, that many, many years ago the county set up the CPU, this community prosecution unit,  to assist the building inspection and the code enforcement division so that they could work together to make sure these homes are in compliance and to make sure that unsafe conditions aren't existing, that the code enforcement units aren't able to address so that there's not a lingering time. If there's code violations, then they're dealt with right away to eliminate the safety issue. And that's why there's kind of this special section. So they're there to bring criminal charges, misdemeanor or otherwise, against the landlords if they find unsafe conditions? If there are violations of the code or other laws pertaining to those type of homes, then, yes, the DA is there to prosecute them to make sure that they are in compliance so that individuals aren't living in unsanitary conditions or unsafe conditions and so that homes like that don't continue to operate. In regard to the employment issue, it seems, at least after listening today, which is somewhat new to me, that this isn't even an employment claim. It's a housing discrimination claim that somewhat links to the employment action that was taken against Mr. Maddox and Ms. Alexandru. However, it was represented that Mr. Maddox is actually representing the rights of the property owner and not his own rights, and therefore I'm not sure exactly how we get to any kind of claim for employment action. Regardless... It's like a whistleblower retaliation claim. Right, which isn't... In disguise, maybe, but... Right, yes. Asserted under a 1983 claim in the complaint. There's no whistleblower claim asserted in this case. It's not a cause of action. If it is a cause of action, the employee plaintiffs, Mr. Maddox and Ms. Alexandru, did not file a FEHA claim. They did not file a claim with the EEOC. If they're now alleging federal whistleblower protection, they did not exhaust the required administrative remedies to make such a claim. So at this point, I'm not sure how we can remedy a whistleblower action without any evidence to support it. Beyond that, these allegations regarding the discovery and essentially it sounds that the appellants are saying, we can't prove or we haven't been able to prove our housing discrimination claim because we haven't been able to finish discovery. The discovery period cut off. There were motions made. They were not granted. These documents that have allegedly been destroyed by Ms. Kimura, it was represented by the appellees, not on the record, not in motion. I think you mean the appellants. No. By the appellees. In response to the appellants' claim that these documents were destroyed, the appellees did an investigation into what documents were being discussed. And these are all things that occurred in phone conversations during the discovery period in this case before a motion for summary judgment was filed. And it was discovered that those documents were produced to the plaintiffs or to the appellants previously during the criminal prosecution of the case. And that when Ms. Kimura retired, the documents in her office were, I guess, thrown away. We don't really know. We can't find this box. But the box, she testified in her deposition that the box of documents is the exact same documents that were produced to these appellees and their attorney. The appellees. These appellants. I'm sorry. And their attorney during the criminal prosecution. So the documents, they have. They have seen. There's not new evidence. Okay. So at this point, based on the claims made today, the claims made in the appeal, the appellants have failed to establish that there is a genuine issue as to any material fact in this case. They failed to contradict the specific evidence that's been. Well, they do try to establish a disputed fact over consent, don't they? Consent to the inspection. Well, in my reading of the appeal, they claim that there wasn't consent to certain individuals. There was consent to others. But regardless, Ms. Nguyen could not have granted consent because she didn't have authority over the premises, which, therefore, then her co-appellant technically has violated the Fourth Amendment by entering and inspecting the home. They're going to also claim she couldn't have given the consent anyway. You mean Ms. Alexandru. Right. Violated her rights from the appellant's own theory. Technically, yes. There's so many different levels to the claim. They claim there was no consent given. Right. However, they don't actually specifically state, Ms. Nguyen does not say in a declaration in her deposition anywhere, I said no, I said no, they could not enter, or I said yes, this person, this person, that person can enter, but not you. She doesn't say that she didn't speak with the Lieutenant To, who was there to interpret, requested consent and received consent from her. There's no specific contradiction of this evidence. Then past that, they say, well, it doesn't matter, this isn't a consent issue, actually, in the reply brief, and that Ms. Nguyen couldn't have given authority to enter. And so, therefore, if she couldn't have even granted limited consent to Ms. Alexandru, then Ms. Alexandru herself has violated the, I guess, Fourth Amendment rights of the tenants, that now these appellants are attempting to represent these third-party individuals without any basis for that representation. These aren't individuals that can't bring the claim on their own. Okay. Thank you. Thank you. Your Honor, it's very important for me to emphasize that the appellants in this case, despite three different sets of discovery propounded, never received one answer to any interrogatory or one document that was requested. In fact, we do have an affidavit that was submitted as part of our defense in the motion for summary judgment, that there was an intern employed by the County of Sacramento Planning Department who knows that the planning department file was purged, and that one of the documents in there we know was an email from Linda Kimura to one of the planners about the person who was subdividing that property on which this group home was located, right in the middle of it, a man named Angelo Socopolis, who was using Victor Nguyen as a kind of consultant or go-between to submit the subdivision map on which this property was identified. These are documents that would have helped us prove, and we still can dispute the facts despite their absence, but mostly it shows a kind of bad faith on the part of the Respondents in regard to their conduct of the litigation in this case. It's important for us to point out that a lot of the allegations they claim give them some sort of independent excuse for violating the civil rights of these individuals concerning the smoke detectors. That was never charged as a violation, ultimately. The trench had a permit, which was one of the most mysterious aspects of this case, was why the fire department was concerned about the trench. All right. But otherwise, if you don't have any other questions, I think it's just, as a final word, it's important to understand that this is a Section 1983 case, that FEHA does not require exhaustion of administrative remedies in housing discrimination cases, and that Ms. Alexandru and Mr. Maddox have risked their careers and livelihoods, ultimately, to vindicate the rights of persons who can't vindicate them for themselves. Thank you. Thank you, counsel. Thank you both. The case argued is submitted, and we'll stand adjournment for our recess for the day. All right.
judges: Pallmeyer, Rymer, Fisher